IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JASON THOMPSON, | ) | Case No. 1:19-cv-2335 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Jason Thompson, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act and a period of Disability Insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 11.  Because the administrative law judge ("ALJ") properly evaluated the medical opinion evidence and did not err in determining Thompson's RFC, and because Thompson has not identified any incorrect application of legal standards, his decision must be AFFIRMED.

## II.      Procedural History

Thompson applied for SSI and DIB on August 8, 2014.  (Tr. 228-229).[1]  He alleged that he became disabled on February 3, 2015, due to heart disease, two [stents], 11% damage of the heart, asthma, sleep apnea, bad back/four crushed vertebra.  (Tr. 228, 277).  The Social Security Administration denied Thompson's applications initially and upon reconsideration.  (Tr. 159, 168, 178, 185).  Thompson requested an administrative hearing.  (Tr. 190).  ALJ Joseph A. Rose heard Thompson's case and denied his claims in an October 25, 2018 decision.  (Tr. 11-17).

On August 27, 2019, the Appeals Council denied further review, rendering ALJ Rose's decision the final decision of the Commissioner.  (Tr. 1-4).  On October 8, 2019, Thompson filed a complaint seeking judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.     Evidence

### A.      Relevant Medical Evidence

Thompson was hospitalized from January 31, 2015 through February 3, 2015 for symptoms of dizziness, lightheadedness, and chest discomfort.  (Tr. 343-344).  His blood pressure was 176/92mmHg and he had 1+ edema of the bilateral lower extremities.  (Tr. 344). An EKG showed sinus bradycardia, marked left axis deviation and left ventricular hypertrophy and ST-T change.  (Tr. 351).  An echocardiogram showed severe concentric left ventricular hypertrophy with diastolic dysfunction, preserved LV systolic function, left atrial enlargement, and 1+ posteriorly directed mitral regurgitation.  (Tr. 354).  Thompson was diagnosed with acute coronary syndrome, non-ST elevation myocardial infarction, resistant hypertension, obesity, reactive airway disease, and longstanding history of poorly controlled hypertension and noncompliance because of medication side effects interfering with quality of life.  (Tr. 341).

---

[1] The administrative transcript is in ECF Doc. 9.

Thompson underwent stenting for single vessel disease involving 95-99% stenosis of the large OM of codominant left circumflex artery.  (Tr. 346).

On February 13, 2015, Thompson followed-up with Anna M. Broz, MSN, RN, CNP, at North Ohio Heart.  (Tr. 506).  Nurse Broz found that Thompson could return to work with a ten-pound weight limit.  (Tr. 506).  He had lost some weight and now weighed 331 pounds.  (Tr. 507).

On March 5, 2015, Thompson followed-up with Dr. Geetha Mohan to determine whether he could return to work.  Dr. Mohan assessed hypertension, obesity, coronary artery disease, status post recent percutaneous coronary intervention and drug eluting stent, preserved left ventricularly systolic function and nicotine dependence.  Thompson weighed 338 pounds.  Dr. Mohan opined that Thompson could return to work without any restrictions from a cardiac perspective.  (Tr. 503).

Thompson established care with Dr. Musab Saeed on April 9, 2015.  Thompson reported wrist pain, obesity, cough, shortness of breath, chest pain, and back pain.  (Tr. 550).  His weight was 336 pounds.  Dr. Saeed diagnosed traumatic arthritis of the right wrist, hyperlipidemia, obesity, vitamin D deficiency, chest pain, coronary artery diseases, asthma, chronic low back pain, MRSA infection and cellulitis.  (Tr. 552).  On April 22, 2015, an MRI of Thompson's right wrist showed mild tenosynovitis or tendinosis of the first extensor; 7x5 mm synovial cyst or ganglion anterior to the radiocarpal joint; suspected linear tear of the scapholunate and lunotriquetral ligaments; and some attenuation of the triangular fibrocartilage complex, "at the ulnar attachments."  (Tr. 338-339).

Thompson followed-up with Dr. Saeed on May 1, 2015.  (Tr. 546).  Thompson reported fatigue, continued pain and tenderness, and joint and muscle pain.  He weighed 333 pounds.  Dr.

Saeed noted that the MRI showed a ligament tear and a ganglion cyst. Otherwise, his diagnoses were the same. (Tr. 549).

On May 5, 2015, Thompson went to the emergency room at Mercy Regional Medical Center complaining of low blood pressure and dizziness. (Tr. 331). A chest x-ray showed no acute cardiopulmonary disease. An EKG showed sinus bradycardia, marked left axis deviation, and left ventricular hypertrophy and ST-T change. (Tr. 336). He was diagnosed with hypotension, most likely related to his medications. (Tr. 331).

Thompson went to the emergency room again on June 25, 2015 with complaints of chest pain. (Tr. 326-327). A chest x-ray showed poor penetration, but no overt heart failure. Examination showed a regular heart rate and rhythm with no obvious murmur. Thompson was diagnosed with noncardiac chest pain. (Tr. 327).

On July 17, 2015, a polysomnography test revealed severe sleep apnea, mild O2 desaturation present with lowest saturations of 85% and O2 less that 89%; severe snoring; abnormal sleep efficiency, findings consistent with prolonged REM onset; and findings indicative of severe sleep fragmentation. (Tr. 321-322).

Thompson saw Dr. Saeed on September 23, 2015 for complaints of chest congestion, productive cough, fevers, chills, headaches, and sinusitis. He also complained of fatigue, shortness of breath, chest pain and back pain. (Tr. 538). Dr. Saeed assessed acute maxillary sinusitis, other seasonal allergic rhinitis, hyperlipidemia, vitamin D deficiency, cough and fatigue. (Tr. 540).

Thompson saw Dr. Mohan on October 8, 2015 following an emergency room visit for chest pain. His pain was worse with deep breathing and did not sound like angina pectoris. (Tr. 498). Thompson had lost almost 60 pounds. Dr. Mohan assessed hypertension, coronary artery

disease, preserved left ventricular systolic function, increased body mass index, nonanginal chest discomfort, an ECG with lateral ST-T abnormality unchanged, and nicotine dependence.  (Tr. 498).

Thompson saw Dr. Saeed on November 3, 2015.  Thompson had gained weight and was now 344 pounds.  He complained of shortness of breath with activity, fatigue, ear pain, and dandruff with fungal infection.  (Tr. 532).  Dr. Saeed assessed weight gain, morbid obesity, ST elevation myocardial infarction involving left anterior descending coronary artery, gastroesophageal reflux disease, vitamin D deficiency, right ear pain, essential hypertension, moderate persistent asthma, and pure hypercholesterolemia.  (Tr. 537).

Thompson went to the emergency room on December 17, 2015 after experiencing sudden chest pain while eating and unusual sweating.  (Tr. 406).  A nitroglycerin tablet did not resolve the pain.  The doctor's impression was stable angina.  (Tr. 408).

Thompson visited the emergency room on April 14, 2016 complaining of dizziness and vertigo.  (Tr. 392).  He reported dizziness, nausea, weakness and spinning sensation.  He had a decreased ability to stand and walk.  (Tr. 410).  Examination showed mild distress, anxiousness, and positive nystagmus.  (Tr. 411).  The final impression was acute syncope and vertigo.  (Tr. 412).

Thompson returned to the emergency room the next day complaining of tightness in his chest and arms.  Examination showed that he had a regular heart rate and rhythm; his back examination was normal; he had normal range of motion in his extremities; and a chest x-ray was also normal. (Tr. 472-475).

Thompson saw Dr. Mohan on May 10, 2016.  He reported large fluctuations of his blood pressure at home, episodes of palpitations, diaphoresis and lightheadedness which were not

related to activity but he experienced fatigue when the episodes occurred.  (Tr. 494).  Dr. Mohan assessed palpitations and obesity.  (Tr. 496).

On May 16, 2016, Thompson underwent a graded exercise test.  The test showed submaximal non-diagnostic ECG treadmill stress test and non-exercise provided ischemic ECG changes or chest pain symptoms with submaximal stress.  (Tr. 742-743).

Thompson started treating with Dr. Mary Revolinsky on October 3, 2016.  Thompson weighed 342.4 pounds.  (Tr. 671).  He reported anxiety, neck pain and tremors in his head, chin, tongue, voice, trunk, both hands, both arms, both feet and both legs.  (Tr. 670).  Thompson also complained of fatigue, weight gain, seasonal allergies, difficulty breathing on exertion, abdominal pain, back pain, joint pain, muscle weakness, dizziness, headaches, numbness, anxiety, depression, insomnia, excessive thirst and excessive urination.  (Tr. 671).

Thompson saw Dr. Revolinsky on October 21, 2016 for an A1C check.  (Tr. 668-669). Dr. Revolinsky described the problem as mild and noted that Thompson had been compliant. (Tr. 668).  Examination showed clear lungs, regular heart beat and rhythm, no edema, normal posture and gait.  Dr. Revolinsky diagnosed high blood pressure, coronary artery disease, asthma, GERD, allergic rhinitis, anxiety, tremor, palpitation, and headache.

On October 30, 2016, Thompson went to the emergency room for back pain that radiated to his buttocks.  (Tr. 725-731).  A musculoskeletal examination showed normal spine, with no tenderness.  He was able to sit, stand and bend.  (Tr. 728).  He was discharged with a diagnosis of lumbago.  (Tr. 725).

Thompson went to the emergency room on November 16, 2016 for chest pain.  (Tr. 700). The chest pain was in his mid-anterior sternal region and constant.  (Tr. 702).  Thompson described the pain as burning and severe.  It improved with nitroglycerine.  (Tr. 703).

6

Thompson's chest x-ray was negative.  (Tr. 723).  His EKG demonstrated normal sinus rhythm, left anterior fascicular block, left ventricular hypertrophy with repolarization abnormality.  (Tr. 724).

Thompson followed-up with Dr. Mohan on December 21, 2016.  Dr. Mohan noted that Thompson's hypertension was controlled with multiple medications and that Thompson was compliant.  Physical examination returned similar findings to Thompson's October 2015 appointment.  (Tr. 761-764).

Thompson was hospitalized from November 3, 2017 through November 5, 2017 for chest pains, shortness of breath and syncopal episodes.  (Tr. 877-892).  He reported not following-up with his cardiologist for over a year.  (Tr. 879).  Examination showed diminished lung sounds. An EKG showed normal sinus rhythm and a chest x-ray showed no evidence of active cardiopulmonary disease.  (Tr. 883).  Thompson received breathing treatments, steroids and nitroglycerin.  He was diagnosed with shortness of breath, unspecified chest pain and syncope, unspecified.  (Tr. 885).

Thompson saw Dr. Deborah Vicario at North Ohio Heart on November 21, 2017.  He reported episodes of passing out and feeling confused, fatigue, irregular sleep patterns, increased shortness of breath and severe obstructive sleep apnea.  (Tr. 873).  Examination showed diminished breath sounds due to body habitus.  Thompson's heart rate and rhythm were normal, his affect was appropriate and his gait was within normal limits. (Tr. 873-874).

On November 27, 2017, Thompson saw Dr. Chandra Singh for respiratory and sleep disorder.  Thompson weighed 350 pounds.  Examination showed regular heart rate and rhythm, clear lungs, normal muscle strength in all muscle groups, and normal range of motion.  Dr. Singh diagnosed obstructive sleep apnea, obesity, chronic obstructive pulmonary disease and allergic

rhinitis.  (Tr. 934-939).   Dr. Singh ordered a pulmonary function test that was performed on December 4, 2017.  The test showed minimal airway obstruction present suggesting small airway disease.  (Tr. 946-947).

Thompson saw Dr. Vicario on December 11, 2017.  Thompson was morbidly obese, normotensive, alert and in no acute distress.  He was diagnosed with vitamin D deficiency, hyperlipidemia, and diabetes mellitus.  (Tr. 865-868).

A sleep study in January 2018 was suggestive of severe obstructive sleep apnea with desaturations and disruption of sleep architecture.  (Tr. 949-950).  CPAP titration was recommended.  (Tr. 950).

Thompson saw Dr. Vicario on February 7, 2018.  He reported having difficulty ambulating due to chronic back pain.  He also reported numbness and tingling in his hands and feet, sometimes radiating to his neck.  He reported that he spent 90% of his time in a seated position, even when he was sleeping.  He also reported that his low back and hips "locked up" when he stood.  This chronic pain was affecting his activities of daily living.  Dr. Vicario noted that Thompson was morbidly obese, had difficulty raising from a chair and was ambulating slowly due to his pain.  (Tr. 859).  His depression index score indicated moderate depression. Dr. Vicario diagnosed hypertension, diabetes mellitus, low back pain, upper extremity neuropathy, history of vertebral fracture, and current, every day smoker.  (Tr. 863).

Thompson saw Dr. Singh on March 1, 2018.  He reported unexpected weight gain and sleep disturbance.  He weighed 358 pounds.  Dr. Singh diagnosed obstructive sleep apnea, obesity, chronic obstructive pulmonary disease with acute exacerbation and allergic rhinitis due to pollen.  (Tr. 942-944).

On March 12, 2018, Thompson saw Dr. Vicario to discuss results from a functional capacity assessment performed by Todd Ott, an occupational therapist to whom she had referred Thompson.  (Tr. 974, Tr. 956).  Thompson was morbidly obese, had diminished breath sounds due to body habitus, and trace edema in both lower extremities.  Dr. Vicario assessed diabetes mellitus, chronic pain and current everyday smoker.  (Tr. 977).

Thompson returned to Dr. Vicario on March 19, 2018.  Thompson weighed 353 pounds. Dr. Vicario assessed "disability of walking", encounter for disability assessment, low back pain, history of vertebral fracture, coronary artery disease, diabetes mellitus and chronic pain.  (Tr. 973).

### B.    Relevant Opinion Evidence

#### 1.    State Agency Consultants

On November 30, 2016, state agency physician, Esberdado Villanueva, M.D., reviewed Thompson's file and opined that he could perform light work – occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, standing and/or walking for a total of about 6 hours in an 8 hour workday and sitting for a total of about six hours in an eight hour workday.  He opined that Thompson could never climb ladders, ropes, or scaffolds; and could only occasionally climb ramps and stairs.  He opined that Thompson must avoid concentrated exposure to extreme cold and heat and "even moderate exposure" to hazards such as machinery and heights.  (Tr. 105-107, 120-122).  On March 7, 2017, Obiaghanwa Ugbana, M.D., reviewed Thompson's records and affirmed Dr. Villanueva's opinions.  (Tr. 135-137, 148-150).

## 2.    State Agency Examining Physicians

On January 7, 2016, Dr. Khalid Darr examined Thompson at the request of the state agency. (Tr. 364-378).  Thompson reported that he was disabled due to a history of coronary artery disease, bronchial asthma, low back pain and morbid obesity. (Tr. 364).  Thompson was 5'6" and weighed 356 pounds. (Tr. 365).  Physical examination returned mostly normal results, however, Thompson had decreased range of motion of the dorsolumbar spine (Tr. 371) and the knees. (Tr. 372).  Dr. Darr diagnosed a history of bronchial asthma; a history of coronary artery disease, status post two stents; low back pain, remote history of motor vehicle accident; and morbid obesity. (Tr. 367).  Dr. Darr opined that Thompson may have difficulty with foot controls due to his morbid obesity. (Tr. 367)  He also opined that Thompson was limited to lifting/carrying 15-20 pounds frequently, and more than 20 pounds occasionally. (Tr. 368).

On November 19, 2016, Dr. Kyle Walker examined Thompson at the request of the state agency. (Tr. 675-677).  Dr. Walker noted that Thompson had a heart attack and two stents placed in February 2015. (Tr. 675).  Thompson reported being able to sit, stand, and walk for 30-45 minutes without issue.  Examination showed 5/5 strength in Thompson's upper and lower extremities, 5/5 grip strength bilaterally, and a negative straight leg raise test. (Tr. 676).  He had mildly decreased range of motion of the lumbar spine worsened by his body habitus.  Dr. Walker diagnosed myocardial infarction, status post catheterization with stenting.  Dr. Walker opined that the main issue affecting Thompson's ability to work was the "randomness and intermittent nature" of anxiety attacks.  Dr. Walker noted that the physical examination was remarkable for mild decreased range of motion of the lumbar spine, primarily due to obesity, as well as a slight limp.  However, Dr. Walker felt that Thompson's anxiety attacks related to his heart were impacting the reliability of his work.  He noted that the attacks occurred approximately once a

month and considered them mild.  Dr. Walker noted that Thompson did not have any limitations

with sitting, standing, walking, lifting, carrying, handling, hearing, speaking, traveling or with

memory.  (Tr. 677).  Manual muscle testing examination by Dr. Walker was normal except for

reduced range of motion in the dorsolumbar spine.  (Tr. 678-681).

### 3.       Examining Medical Source

On March 2, 2018, Todd Ott, OTR/L, completed a functional capacity evaluation upon

the referral of Deborah Vicario, M.D.  Thompson reported constant pain in the lower back, legs

and numbness in both arms, sensory changes in the body with pins and needles, tremors in both

his arms and hands, weakness and slowed fine motor skills in both upper extremities, limited

active motion patterns in the upper extremities, lower extremities, back and neck, and he had

difficulty with simple tasks due to limited strength, endurance and functional ability.  (Tr. 956).

Thompson gave good physical effort during the testing, but he had difficulty performing

activities that required position changes and use of the extremities in a repetitive fashion.  His

standing tolerance was limited with tasks with a forward flexed head position and slight trunk

flexion.  His lifting skills were limited, and he was unable to tolerate lifting positions in a safe

and consistent manner.  He was limited to lifting six pounds at waist level, less than the

sedentary level.  Thompson required breaks to sit and rest prior to starting another activity. He

had slowed fine motor control.  His hands and arms got numb, painful and fatigued during the

testing.  (Tr. 957).  Mr. Ott opined that Thompson was unable to work around dangerous

equipment; could drive for limited distances and duration; and could only walk 160 feet and then

required a five minute break.  Mr. Ott further opined that Thompson's attendance would be

unreliable due to pain, and that he would be unable to complete an eight hour workday.  (Tr.

958).  Mr. Ott opined that Thompson could rarely or never sit, stand, walk, balance, crawl, squat,

kneel, stoop, crouch, reach, push/pull, grasp, use fine control, or operate foot controls.  (Tr. 959). He further opined that Thompson would not be able to return to any employment position and that his functional tolerance was less than the sedentary level.  (Tr. 960).

The record contains an undated, unsigned medical source statement[2] stating that Thompson was unable to lift/carry; could stand/walk one hour total and four minutes at a time; and could sit a total of 30 minutes to three hours out of an eight hour day, but only 20-30 minutes at a time.  (Tr. 963).  The statement indicates that Thompson could only rarely climb, balance, stoop, crouch, kneel, crawl, reach, push/pull, and perform fine and gross manipulation.  (Tr. 963-964).  The medical source opined that Thompson needed six to eight hours of breaks, and that his pain interfered with his concentration, took him off task, and would cause absenteeism.  (Tr. 964).

### C.      Relevant Testimonial Evidence

Thompson testified at the ALJ hearing before ALJ Joseph Rose on May 18, 2018.  (Tr. 59-72).  Thompson was 37 years old and lived in a house with a roommate and his 16-year-old son. (Tr. 59, 63).  He had obtained his GED and attended three years of school to become a certified welder, but he had not worked since 2015.  (Tr. 59-60).

Thompson had tried to work but would stop to go to the hospital when he experienced chest pains.  (Tr. 61).  He had two stents and 50% blockage in one artery.  He had also been hospitalized for diabetes, which had been diagnosed a month and a half before the hearing.  (Tr. 62, 66).  Thompson was a smoker.  He experienced blackouts and anxiety attacks.  (Tr. 62-63, 71).  He weighed 330 pounds.  (Tr. 65).  Thompson reported poor sleep and that he slept at a 45

---

[2] Thompson argues that the medical source statement was attached to Mr. Ott's functional capacity evaluation.  ECF Doc. 13 at 12.  He further asserts that it is reasonable to assume that Dr. Vicario would have completed the medical source statement because it was sent to her.  ECF Doc. 13 at 17.

degree angle.  (Tr. 67-68).  His medications caused side effects such as stomach cramping and diarrhea.  (Tr. 70).

Thompson was unable to work due to blackouts, not being able to walk more than 30-40 feet, sharp pains in his back when bending over, pain in his hips and profuse sweating.  (Tr. 63-64).  Thompson was using a cane when walking.  He was told to use the cane after a functional capacity evaluation.  (Tr. 64).  Thompson's hands and feet would go numb causing him to fall and drop things.  (Tr. 64-65).

Vocational Expert ("VE") Thomas Nimberger also testified at the hearing.  (Tr. 73-75). The ALJ asked the VE to consider an individual of Thompson's age and education who had his RFC, as determined by the ALJ.  The VE testified that this individual would not be able to perform Thompson's former work as a welder inspector or groundskeeper.  (Tr. 74).  However, this individual could perform other jobs in the national economy.  (Tr. 74-75).  The VE testified that there would not be any jobs available for an individual who was unable to sit, stand or walk for an eight hour workday without taking frequent unscheduled breaks and could not lift even 10 pounds occasionally and would be unable to complete two or more workdays per month.  (Tr. 74-75).

## IV.   The ALJ Decision

The ALJ made the following paraphrased findings relevant to this appeal:

5.  Thompson had the residual functional capacity to perform light work except he could not climb ladders, ropes or scaffolds; could only occasionally climb ramps or stairs; could frequently balance, stoop, kneel, crouch, or crawl.  He was also required to avoid concentrated exposure to extreme temperatures and even moderate exposure to unprotected heights, working around dangerous machinery and moving mechanical parts.  (Tr. 17).

10. Considering Thompson's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform.  (Tr. 26).

Based on all of his findings, the ALJ determined that Thompson was not under a disability from February 3, 2015 through the date of his decision. (Tr. 27).

## V. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rogers*, 486 F.3d at 241; *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is not our role to try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the

15

claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.    Medical Source Opinions

Thompson argues that the ALJ failed to assign appropriate weight to Mr. Ott's opinion and to the unsigned medical source statement, which he attributes to Dr. Vicario.  At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. §§ 404.1527(c), 416.927(c).[3]  An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Id.*  (quoting 20 C.F.R. § 404.1527(c)(2)).  Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. §§ 404.1527(c), 20 C.F.R. § 416.927(c).  Inconsistency with nontreating or nonexamining physicians' opinions alone is not a

---

[3] 20 C.F.R. §§ 404.1527(c) and 416.927(c) apply because Thompson's claim was filed before March 27, 2017.

good reason for rejecting a treating physician's opinion.  *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

Mr. Ott is an occupational therapist, and was properly designated as an "other source" by the ALJ.  Thompson argues that the ALJ erred in assigning less than controlling weight to the opinion of Mr. Ott.  See 20 C.F.R. §§ 404.1527(c), 20 C.F.R. § 416.927(c).  But, under the applicable Social Security Regulations, an occupational therapist is not an "acceptable medical source" entitled to the type of "controlling weight" an "acceptable medical source" might be entitled to.  See 20 C.F.R. §§ 416.902(a)(1) - (8), 416.927(a)(1), 416.927(f).  However, the regulations do provide that these "other source" opinions still must be considered, using the same factors listed in 20 C.F.R. §416.927(c).  The regulations further provide "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning."  20 C.F.R. §416.927(f)(1)-(2).

Social Security Ruling 06-03p, 2006 SSR LEXIS 5 further explains how opinion evidence from "other sources" should be treated. SSR 06-03p, 2006 SSR LEXIS 5 provides information from "other sources" (such as an occupational therapist) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 SSR LEXIS 5, 2006 WL 2329939 at *2-3 (August 9, 2006). Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other

17

evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03p, 2006 SSR LEXIS 5, the ALJ should have discussed the factors relating to his treatment of [the claimant's] assessment, so as to have provided some basis for why he was rejecting the opinion"). *See also Williams v. Colvin*, 2017 U.S. Dist. LEXIS 41384, 2017 WL 1074389 at *3 (N.D. Ohio March 22, 2017); *Flores v. Berryhill*, 2017 U.S. Dist. LEXIS 214430, *41-42 (N.D. Ohio Dec. 15, 2017).

> Here, the ALJ summarized Mr. Ott's findings and evaluated his opinion as follows:

> A finding that an individual is "disabled" or "unable to work," is an administrative finding and is an issued reserved to the Commissioner (20 CFR 404.1527(e)(1) and 416.927(d)).  The undersigned notes that Mr. Ott is an occupational therapist registered/licensed and is not considered to be an acceptable medical source.  * * *  The undersigned notes only an acceptable medical source can provide a medical opinion (20 CFR 404.1527(a)(2) and 416.927(a)(2)).  Furthermore, the totality of the evidence does not support a less than sedentary exertional level.

(Tr. 23).

As argued by the Commissioner, the ALJ adequately explained the weight assigned to Mr. Ott's opinion, who was properly considered to be an "other source" under the regulations. The ALJ was not required to provide as detailed an explanation for his weighing of an occupational therapist's opinion as he was for an acceptable medical source.  However, as noted above, he *was* required to consider the opinion and other factors such as how long the source had known the individual, how consistent the opinion was with other evidence, and how well the source explained the opinion.  The first factor does not weigh in Thompson's favor because Mr. Ott was not a treating source; he saw Thompson only once to perform the functional capacity evaluation, a fact implied by the ALJ's statement that Mr. Ott had completed a functional capacity evaluation.  And, the ALJ expressly stated that Mr. Ott's opinion was not consistent with the other evidence.  (Tr. 23).  The ALJ's decision had already provided a lengthy recitation

of the medical evidence and discussed the reports and opinions of two examining physicians; and the ALJ found that Mr. Ott's opinions were not consistent with those opinions.  (Tr. 23).  The ALJ also noted that he was not required to accept Mr. Ott's finding that Thompson was unable to work because that determination is reserved to the Commissioner.  20 CFR 404.1527(e)(1) and 416.927 (e)(1).

Thompson argues that Mr. Ott's opinion was consistent with other evidence in the record.  ECF Doc. 13 at 17-19.  That may be.  But, because Mr. Ott was an "other source" and not an "acceptable medical source" under the regulations, his opinion was not entitled to controlling weight and the ALJ was not required to provide "good reasons" for assigning less than controlling weight to it.  Even so, the ALJ *did* consider Mr. Ott's opinion and explained his rejection of it.  Thompson has not identified any error in the ALJ's application of the regulations to the report prepared by Mr. Ott, an examining occupational therapist.

Thompson also argues that the ALJ improperly evaluated the unsigned medical source statement in the record.  (Tr. 963-964).  Thompson states that this unsigned statement was attached to the functional capacity assessment report prepared by Mr. Ott.  However, Thompson does not argue that Mr. Ott prepared the medical source statement.  Rather, he states that "it is reasonable to assume that Dr. Vicario would have completed the medical source statement," because Mr. Ott's report was sent to her for review.  ECF Doc. 13 at 17.  Unfortunately for Thompson, there is no evidentiary support for this inference, and if the report was completed by Mr. Ott (as appears more likely), the ALJ was not obligated to evaluate it in the same manner required for treating source opinions.

The ALJ summarized the opinions stated in the unsigned medical source statement and then stated:

The undersigned notes this opinion was not signed and the limitations are rejected because the severe limitations are not supported by the preponderance of the evidence.  Furthermore, a finding that an individual is "disabled" or "unable to work" is an administrative finding and is an issue reserved to the Commissioner (20 CFR 404.1527(e)(1) and 416.927 (e)(1)).  Medical opinions on these issues must not be disregarded; but they cannot be entitled to controlling weight or even given special significance.  (20 CFR 404.1527(d) and 416.917(d)).

(Tr. 24).  As with his explanation of Mr. Ott's report, the ALJ properly evaluated the unsigned medical source statement.

It is not clear who prepared this medical source statement, but the ALJ was not required to assign controlling weight to it because there was no evidence showing that it was prepared by a treating physician.[4]  To the contrary, it appears that the medical source statement may have been completed by Mr. Ott[5] and only reviewed by Dr. Vicario.  And, if that is true, the statement was not from a treating source.  Because there is no evidence that this statement was from a treating physician, the ALJ was not required to assign controlling weight to it or to state good reasons for the weight he did assign.  However, he *did* explain why he rejected the opinion.  As already noted, the ALJ had already summarized Thompson's medical records and had explained the weight assigned to the opinions of two examining physicians who had found that Thompson's functional limitations were relatively mild.  The ALJ even found that Thompson was *more* limited than those opinions.  (Tr. 23). The ALJ then considered the opinions of Mr. Ott and the unsigned medical source statement which found that Thompson was severely limited in his functional abilities.  The ALJ found that these opinions were not supported by substantial evidence and that the statement of disability was reserved to the Commissioner.  In so doing, he

---

[4] Notably, Thompson has not argued that the ALJ had an obligation to seek more information regarding the author of the medical source statement.

[5] The signature at the bottom of a second medical source statement (Tr. 966) appears to be similar to Mr. Ott's signature on a cover page to Dr. Vicario.  (Tr. 960).  And, this second medical source opinion signed by Mr. Ott (pp. 9/012-10/012) was included in the same fax as the unsigned, undated medical source opinion (pp. 7/012-8/012).  (Tr. 963-966).

complied with 20 C.F.R. §§ 404.1527(c), 416.927(c), which required him to consider every medical source opinion and to determine if they were consistent with the other evidence in the record.  Thompson has not identified any error in the ALJ's application of the regulations to the unsigned medical source statement.

### C.     Residual Functional Capacity

Thompson also argues that the ALJ's RFC determination failed to address significant limitations imposed by plaintiff's severe impairments which would preclude the performance of sustained work activity.  ECF Doc. 13 at 20.  Specifically, he argues that the ALJ should have further restricted his RFC based on his limitations in using his upper extremities.  He cites portions of the record where he complained of numbness and tingling in his hands, a tremor, weakness and pain and neuropathy in his right wrist.  ECF Doc. 13 at 21.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

A plaintiff's residual functional capacity is defined as "the most a claimant can still do despite the physical and mental limitations resulting from her impairments."  *Poe v. Comm'r of Soc. Sec.,* 342 F. App'x 149, 155 (6th Cir. 2009); see also 20 C.F.R. §§404.1545(a) and

416.945(a).  An ALJ may not determine the residual functional capacity by failing to address portions of the relevant medical record, or by selectively parsing the record – i.e., "cherry-picking" it – to avoid analyzing all the relevant evidence.  *Gentry v. Comm'r of Soc. Sec.,* 741 F.3d 708, 723 (6th Cir. 2014).

An ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding, and does not explain why he chose to credit one portion over another.  *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715 *44 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

Here, the ALJ's decision considered all of the relevant evidence in forming Thompson's RFC and did not "cherry-pick" it.  The ALJ acknowledged Thompson's statements that he could not "get through dinner" without dropping his fork.  (Tr. 18).  The ALJ also noted that Thompson reported numbness and tingling in his fingers to Dr. Vicario on February 7, 2018.  But, as the Commissioner argues, the evidence regarding the numbness and tingling in Thompson's hands was sparse and intermittent.  Imaging from 2015 showed that Thompson had arthritis of the wrist and a ganglion cyst.  (Tr. 548).  Then three years later, in 2018, Thompson complained of pain and weakness in his hands to Dr. Vicario and Mr. Ott.  (Tr. 670, 956).  However, between those points, there is very little evidence of functional limitations in Thompson's upper extremities.

The occasional nature of Thompson's upper extremity limitations is also shown in the medical source opinions.  The two physicians who examined Thompson in 2016 (after his wrist arthritis and ganglion cyst diagnosis) did not note any limitations in the use of his upper extremities. (Tr. 23).  Dr. Darr found that his upper extremity functions for reaching, handling, fine and gross movements were intact.  (Tr. 367).  After examining his hands, she reported:

> Examination of the hands reveals no tenderness, redness, warmth or swelling.
> There is no atrophy and the claimant is able to make a fist bilaterally.  There are
> no Heberden or Bouchard's notes.  Grip strength measures 114, 114 and 104 kg of
> force on the right and 89, 101, and 90 kg of force on the left.  This is normal and
> graded 5/5 bilaterally.  The claimant is able to write and pick up coins with either
> hand without difficulty.

(Tr. 366).  Dr. Walker also observed that Thompson had 5/5 strength in the upper extremities and a 5/5 grip in both hands.  (Tr. 676).

Mr. Ott's assessment and Dr. Vicario's treatment notes, on the other hand, evidence more severe limitations in Thompson's upper extremities.  But, as already explained, the ALJ did not err when he decided that Dr. Vicario's notes and Mr. Ott's opinions were inconsistent with the overall record.

When Thompson applied for disability benefits, he did not mention any functional limitations with his hands or upper extremities.  (Tr. 277).   When asked at the administrative hearing what prevented him from working, he responded, "The blacking out, not being able to walk more than 30 to 40 feet without having to stop.  I can't bend over because I get sharp pains in my back.  I get, that's like, I'm just sitting here now and I'm sweating profusely.  The walk up here, it is, it's extremely hard for me to do."  (Tr. 64).  Thompson later testified that his hands and feet go numb "all the time."  But the ALJ was not required to accept Thompson's testimony at face value.  *See, Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475- 476 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017).  And Thompson's own testimony may have

23

called into question whether he was really experiencing numbness all the time.  When asked

about the cyst on his wrist, he testified that it kept "coming and going" and caused numbness in

his hand that lasted for a week, about once or twice a month.  (Tr. 67)  "Coming and going"

numbness suggests that he was not experiencing constant, "all the time" numbness.  Though this

discrepancy was not mentioned by the ALJ, he did explain why he found that Thompson's

statements were not supported by the objective evidence.  The court finds that the ALJ's

conclusion that Thompson's symptoms were not entirely consistent with the evidence is

supported by substantial evidence.  Intermittent findings of upper extremity numbness were

inconsistent with a claim of numbness "all the time."  And Thompson's own failure to cite that

condition when he applied for benefits is more consistent with an occasional – rather than

constant – problem.  But even if the court disagreed with the ALJ's finding, the court could not

say that there was no substantial evidence supporting his decision.  The record contained

conflicting evidence regarding Thompson's upper extremity limitations, and the ALJ properly

resolved that conflict.

In deciding Thompson's RFC, the ALJ was required to consider all the evidence in the

record in accordance with the agency's regulations.  20 C.F.R. §§ 404.1520(e), 416.920(e).  As

explained above , he properly evaluated the medical opinions in the record and explained the

weight assigned to them.  He did not ignore the evidence regarding Thompson's hands or upper

extremities.  He acknowledged Thompson's statements (Tr. 18), Dr. Vicario's treatment notes

from February 2018 (Tr. 22), and Mr. Ott's opinion. (Tr. 23-24)  But he also considered the

evidence from examining physicians stating that Thompson was not experiencing any functional

limitations in the use of his upper extremities.  (Tr. 22-23).  And he considered November 2017

treatment notes from Dr. Singh stating that he had normal muscle strength, range of motion and

motor strength throughout his body.  (Tr. 21).  The ALJ followed the proper legal procedures and reasonably drew his factual findings from the evidence in the record.  *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

Thompson cites evidence that could have supported a different RFC finding (ECF Doc. 13 at 20-21), but this court is not permitted to decide the facts anew or reweigh the evidence. The ALJ's decision fell within his "zone of choice," and this court may not second-guess it. *Mullen v. Bowen*, 800 F.2d at 545.  Because substantial evidence supported the ALJ's RFC determination, his decision will be affirmed.

## VI.  Conclusion

The ALJ properly evaluated the medical opinion evidence, including the opinions of Occupational Therapist Ott and the unsigned medical source statement.  The ALJ did not err in determining Thompson's RFC based on *all* of the record evidence.  Because the ALJ's decision was supported by substantial evidence and because Thompson has not identified any incorrect application of legal standards, the final decision of the Commissioner is AFFIRMED.

Dated: July 1, 2020

Thomas M. Parker
United States Magistrate Judge